IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WENDY S. MALISHKA, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | No. 13-0516 |
| v. | : | |
| | : | |
| METROPOLITAN LIFE | : | |
| INSURANCE COMPANY, | | |
|     Defendant. | : | |

**September, 24, 2014**                                                                                                   **Anita B. Brody, J.**

## MEMORANDUM

    Plaintiff Wendy Malishka ("Malishka") brings suit against Defendant Metropolitan Life Insurance Co. ("MetLife") for denying her claim for life insurance proceeds from the Boilermakers National Health and Welfare Fund (the "Plan"). The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Malishka moves for summary judgment on the grounds that the determination was arbitrary and capricious. MetLife cross-moves for summary judgment, claiming its determination was reasonable, proper, and based on substantial evidence in the administrative record. For the reasons discussed below, I will deny Malishka's motion for summary judgment and grant MetLife's motion.

## I. BACKGROUND

    On March 7, 2012, T. Alexander Malishka (the "Decedent") died. At the time of his death, he was a member of Local Union 13 of Boilermakers, Iron Ship Builders and Blacksmiths and Forgers and Helpers (the "Union"). His membership made him a participant in the Boilermakers National Health and Welfare Fund, an employee welfare benefit plan governed by

1

ERISA.  The Plan provides both basic and supplemental life insurance coverage to participating Union members who work enough hours per quarter to be eligible.

   A. **Plan Provisions and Decedent's Work History**

The terms of the Plan are contained in the Boilermakers National Health and Welfare Fund Plan Document for Plan G/GR, The Retiree Plan and Plan M (the "Plan Document").  The Plan Document vests in Metlife, as the Plan's designated claims administrator, discretionary authority to interpret the terms of the Plan and determine eligibility for plan benefits.  The Plan Document provides:

> The Board of Trustees and other Plan fiduciaries and Delegates to whom responsibility for Plan administration has been delegated, will have sole and absolute discretionary authority to determine the applicability of Plan exclusions, limitations and other terms of the plan to determine eligibility and entitlement to Plan benefits in accordance with this Plan document. The Board of Trustees and its Delegates shall have the discretion to make any findings of fact needed to administer the Plan or determine benefits claims, and to construe ambiguous, unclear or implied (but not stated) terms in any way it deems appropriate.

Def.'s Mot. Summ. J. App. of Exs. 119, ECF No. 47.

Article II of the Plan Document provides that eligibility for life insurance coverage is determined for any given "Benefit Quarter" by the number of hours worked in the previous "Eligibility Quarter."  Eligibility Quarters begin on the first day of January, April, July, and October, while Benefit Quarters are staggered by one month, beginning the first day of February, May, August, and November.  *Id.* at 21.  Thus, if an employee works enough hours in the first Eligibility Quarter beginning in January to establish eligibility, he or she will be covered for the second Benefits Quarter beginning in May.

The Plan Document has different requirements for *first establishing* eligibility versus *continuing* eligibility already established.  With respect to Initial Eligibility, section

2.02(a)(1)(A) provides that "[a]n Employee becomes eligible on the first day of the Benefit Quarter next following the end of an Eligibility Quarter in which he worked . . . for at least 350 hours." *Id*.

Continuing eligibility is discussed in section 2.02(a)(5). It provides in relevant part:

> **Continuation of Eligibility.** An Employee who has established initial eligibility will continue to be eligible in each succeeding Benefit Quarter if the Hours including fractional Hours worked for a Contributing Employer or Employers, if any, plus the hours in his reserve bank (as described below) total at least 275 Hours in each Eligibility Quarter which precedes each Benefit Quarter . . . .

*Id.* at 23-24.

The Reserve Bank provisions allow an employee to carry over surplus hours from a particular Eligibility Quarter for use in subsequent quarters. Any hours worked in excess of the 350 hour Initial Eligibility Requirement in a particular quarter are credited to the Reserve Bank. *Id.* at 24. Section 2.02(a)(6) provides, in relevant part:

> (A) The number of work Hours credited to an Employee's reserve bank shall be reduced on the last day of an Eligibility Quarter by the number of Hours which are required, when added to the Hours worked in such Eligibility Quarter, to satisfy the minimum eligibility requirements for the Benefit Quarter next following such Eligibility Quarter.
> (B) An Employee's reserve bank hours will be forfeited under the following circumstances:
> (i) If an Employee's eligibility terminates, any remaining hours in his reserve bank will be forfeited if he does not regain eligibility within 12 months from the date eligibility was lost, except as provided in Appendix C for employees performing Service in the Uniformed Services.

*Id.* at 24-25.

The Plan Document also addresses how to re-establish coverage after losing eligibility for failing to satisfy the Continuing Eligibility provision. Section 2.03 provides, in relevant part:

> [I]f the eligibility of an Employee is terminated because the Hours (including fractional Hours) worked for Contributing Employers during the most recent Eligibility Quarter plus the hours in his reserve bank do not equal at least 275 Hours, he can only become eligible upon meeting the Initial Eligibility requirements described in Section 2.02.

*Id.* at 26.

The Initial Eligibility requirements, Continuation of Eligibility requirements and Reserve Bank provisions are all within section 2.02 of the Plan Document. The Initial Eligibility requirements do not reference the Reserve Bank.

MetLife's administrative record shows that in 2011, the year before he died, the Decedent worked 395 hours in the first Eligibility Quarter, 282.5 hours in the second, 159 hours in the third, and 348.5 hours in the final Quarter. *Id*. at 584.

Applying the terms of the Plan Document to the Decedent's quarterly work history produces the following undisputed results: The Decedent's 395 hours in the first Eligibility Quarter of 2011 qualified him for coverage in the second Benefits Quarter. The 45 hours he worked in excess of the Initial Eligibility requirement were added to his Reserve Bank. Decedent's 282.5 hours worked in the second Eligibility Quarter qualified him under the Continuing Eligibility provisions for coverage in the third Benefits Quarter. However, even crediting the 45 hours in his Reserve Bank, the 159 hours Decedent worked in the third Eligibility Quarter were insufficient to qualify him for coverage. To have qualified for coverage in the Benefits Quarter during which he died, Decedent needed 350 total hours in the fourth Eligibility Quarter to re-establish Initial Eligibility. He only worked 348.5 hours that quarter. Had he been able to use the hours in his Reserve Bank, he would have reached the 350 hour requirement.

    **B.  Procedural History**

On March 19, 2012, Wendy Malishka, the Decedent's mother and Administratrix of his estate, filed a Life Insurance Claim Form with Metlife. *Id.* at 491-492. The Plan submitted a statement to MetLife claiming that Malishka was ineligible for coverage. *Id*. at 489-90. MetLife requested clarification of the Plan's position, and the Plan responded that the Decedent "did not have enough hours worked or reported to have coverage along with the life insurance benefit." *Id.* at 510-12, 514. On December 28, 2012, MetLife denied Malishka's claim. *Id.* at 515-16. MetLife's denial letter notified Malishka that she had 60 days to appeal its determination. *Id.*

Contemporaneous with MetLife's initial denial, Malishka filed suit against MetLife seeking payment of life insurance benefits. *See* Notice of Removal Ex. A, ECF No. 1. Malishka failed to appeal MetLife's determination within the 60 day window, and MetLife filed a motion to dismiss for failure to exhaust administrative remedies. *See* Def.'s Mot. Dismiss, ECF No. 8; Pl.'s Resp., ECF No. 9. On April 11, 2013 MetLife agreed to place the case in suspense to allow Malishka to exhaust Metlife's administrative appeals process, and withdrew its motion to dismiss. *See* Stipulation to Place Case in Civil Suspense, ECF No. 12; Notice of Withdrawal, ECF No. 14.

While reviewing Malishka's claim on appeal, MetLife sought additional information to supplement its administrative record and inform its decision. MetLife provided Malishka with the opportunity to submit additional documentation in support of her claim. Malishka responded by producing only the Decedent's 2010 and 2011 tax returns. Def.'s App. of Exs. 528-59. MetLife also requested and received the quarterly summary of the Decedent's work history from the Union discussed above. *Id.* at 584. The quarterly summary is the only document in the administrative record that provides information about the number of hours the Decedent worked.

Before making its final determination of Malishka's claim, MetLife sought additional

information from the Plan. On August 6, 2013, Timothy Copperwheat, a MetLife claims administrator, and Bridget Hillebert, a Plan employee, exchanged emails. Recognizing the deficiency in Eligibility Quarter three, Copperwheat asked if the Decedent was disabled during that period, and whether there was "any form of hour [Decedent] could have used . . . to bring his total from 348.50 to 350." *Id*. at 586 Hillebert responded that Decedent "was not on disability credit for that quarter," and that Decedent was ineligible because "reserve bank hours cannot be used to re-establish eligibility." *Id.* at 585-86.

Copperwheat expressed apprehension at Hillebert's conclusion regarding the use of Reserve Bank hours for Initial Eligibility. On August 7, 2013, he wrote in MetLife's system:

> Firm Rep is stating Reserve Hours cannot be used to reestablishe (*sic*) eligibility. [Plan Document section 2.02(a)(6)(B)(i)] notes that Reserve Hours can be maintained for up to 12 months, therefore they could have been used to fulfill the 1.5 hours missing. The Firm Rep confirms the reserve hours were still in bank in 4th quarter of 2011.

*Id.* at 593.

On August 13, 2013, MetLife again reviewed the information in the administrative record. *Id.* at 594-95. The review did not discuss Copperwheat's previous entry about the use of the Reserve Bank. On August 22, 2013, MetLife upheld its original adverse determination. *Id*. at 596-97.

## II. Legal Standard

A district court reviews a challenge to a termination of benefits under ERISA under an arbitrary and capricious standard where, as here, the plan grants the decision maker discretionary authority to determine eligibility for benefits. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)). Both the Plan and MetLife have discretionary authority to find facts and interpret the Plan Document.

Under the arbitrary and capricious standard of review, a court must defer to the administrator unless the administrator's decision the decision was "clear error" or not "rational." *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1141 (3d Cir. 1993). The court's scope of review is narrow; it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993), *abrogated on other grounds by Glenn*, 554 U.S. 105. While "the arbitrary and capricious standard is extremely deferential, it is not without some teeth. Deferential review is not no review, and deference need not be abject." *Kuntz v. Aetna Inc.*, Civ. A. No. 10–cv–00877, 2013 WL 2147945, at *4 (E.D. Pa. May 17, 2013) (internal quotations omitted).

A court's arbitrary and capricious review of factual determinations is limited to the administrative record that was before the administrator when it made the decision being reviewed. *Carney v. IBEW Local Union 98 Pension Fund*, 66 F. App'x 381, 385 (3d Cir. 2003) (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997)).

Summary judgment is appropriate where "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "Where the decision [of an ERISA-governed plan] to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Davis v. Broadspire Servs., Inc.*, Civ. A. No. 05–5829, 2006 WL 3486464, at *1 (E.D. Pa. Dec. 1, 2006) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)).

### III. Discussion

MetLife argues its decision to deny benefits was not an abuse of discretion and supported

7

by the evidence contained within the administrative record. Malishka argues that MetLife abused its discretion for two reasons. First, she argues that MetLife's interpretation of the Plan Document as prohibiting the use of Reserve Hours to establish Initial Eligibility was unreasonable. Second, she argues that the structural and procedural conflicts of interest in MetLife's decisionmaking constitute an abuse of discretion.[1]

### A. MetLife's Interpretation of the Plan Document

Malishka claims that the Plan Document allows a participant to use Reserve Hours to establish Initial Eligibility. If true, the Decedent had more than enough hours in his Reserve Bank to bring his hours worked in the fourth Eligibility Quarter of 2011 over the 350 hour threshold, and he would have been eligible for benefits at the time of his death.

Failure to comply with the plain terms of a plan is arbitrary and capricious. *Bill Gray Enters. Emp. Health & Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001). However, when a plan's language is ambiguous and the administrator is authorized to interpret it, courts "must defer to this interpretation unless it is arbitrary or capricious." *McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan*, 340 F.3d 139, 143 (3d Cir.2003). "The determination of whether a term is ambiguous is a question of law. A term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3d Cir. 1991) (citations omitted).

The Plan Document is ambiguous because it does not state conclusively whether Reserve Bank hours may be used to establish initial eligibility. Section 2.03 states that an employee can only regain eligibility "upon meeting Initial Eligibility requirements described in Section 2.02."

---

[1] Just prior to filing for summary judgment Malishka attempted to amend her complaint to include statutory penalties for failure to provide a copy of the Plan Document and for punitive damages. *See* Mot. to Amend Compl., ECF No. 43. As a result, Malishka's summary judgment motion discusses these claims. Because I denied Malishka's motion to amend her complaint, I do not address these issues. *See* Order Den. Mot. to Amend Compl., ECF No. 49.

Def.'s App. of Exs. 26.  MetLife argues that section 2.02(a)(1)(A), the "Primary Initial Eligibility Rule," makes no mention of the Reserve Bank.  *Id.* at 14.  The rule conditions eligibility only on "work[ing] . . . for at least 350 hours" in a particular Eligibility Quarter.  *Id.*  By contrast, the sections of 2.02 that govern maintaining eligibility already established state that an employee will "continue to be eligible" in a subsequent Benefit Quarter only if "Hours worked . . . *plus the hours in his reserve bank*" total 275.  *Id*. at 23-24 (emphasis added).

However, Section 2.02, to which 2.03 refers, contains both the sections on Initial Eligibility and the sections discussing the Reserve Bank.  This creates ambiguity.  Moreover, section 2.02(a)(6)(B)(i) states that an employee maintains the hours in his or her Reserve Bank for four quarters after losing eligibility.  *Id.* at 24.  MetLife's interpretation, which does not allow the use of Reserve Bank hours to establish Initial Eligibility, would make it impossible to use Reserve Bank hours in the first of those quarters.  While this does not make the Reserve Bank provisions inconsistent with MetLife's reading, it is not necessarily the most natural interpretation.

At best however, these textual arguments establish that multiple reasonable interpretations for the Plan Document exist.  They certainly do not establish that MetLife's interpretation is arbitrary or has no support.  Thus, MetLife's interpretation deserves deference. *See, e.g., Ahearn v. Marsh & McLennan Cos.*, 124 F. App'x 118, 123 (3d Cir. 2005) (accepting as reasonable administrator's interpretation because "the definition of the relevant term [was] unclear"); *Keating v. Whitmore Mfg. Co.*, 186 F.3d 418, 422 (3d Cir. 1999) (court refused to substitute its own judgment for that of the administrator, in part, because the administrator did not "controvert the plain language and purpose of the Plan"); *Wright v. Carpenters Pension & Annuity Fund of Phila. & Vicinity*, Civ. A. No. 11-2624, 2013 WL 797442, at *7-9 (E.D. Pa.

Mar. 4, 2013) (accepting administrator's interpretation that plan did not include retroactive benefits to cover time spent appealing admittedly improper eligibility determinations).

### B. Conflicts of Interest

Malishka claims the circumstances under which MetLife came to its conclusion were tainted by conflicts of interest. The Third Circuit recognizes two general categories of conflicts: structural conflicts relating to financial incentives inherent in a plan's design, and procedural conflicts that affect how the administrator arrived at its decision. *Sivalingam v. Unum Provident Corp.*, 735 F. Supp. 2d 189, 195 (E.D. Pa. 2010) (citing *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162, 164-65 (3d Cir. 2007), *abrogated on other grounds by Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009)).

A plan administrator, such as MetLife, who both determines whether an employee is entitled to benefits and also pays those benefits has an inherent structural conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112-15 (2008). However, this is "but one factor among many that a reviewing judge must take into account," and should be given greater weight where case specific "circumstances suggest a higher likelihood that it affected the benefits decision." *Id*. at 117. Although MetLife was affected by this conflict, Malishka fails to point to any evidence that this affected her adverse determination in this case.

Courts must also examine the process by which the administrator came to its decision to determine whether there is evidence of bias. The focus is "whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality." *Post*, 501 F.3d at 165. Ignoring the recommendations of a staff member that benefits should be awarded is a procedural irregularity warranting consideration. *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 394 (3d Cir. 2000), *abrogated on other grounds by Howley v. Mellon Fin. Corp.*, 625 F.3d 788,

792 (3d Cir. 2010).

MetLife's own employee, Timothy Copperwheat, stated during the administrative review of Malishka's claim that Reserve Hours could be used to re-establish the Decedent's eligibility. MetLife never explicitly addressed Copperwheat's argument; the final denial of Malishka's claim only states that the 348.5 hours worked in in the fourth Eligibility Quarter of 2011 "supports the conclusion that [the Decedent] did not work the required number of hours." Def.'s App. of Exs. 597.

However, ignoring the recommendation of a staff member "itself does not prove bias." *Pinto*, 214 F.3d at 394.  Indeed, the other components of MetLife's review suggest an evenhanded and thorough review of Malishka's claim.

Before MetLife initially denied Malishka's claim, it received a statement from the Plan recommending that Malishka's claim had no merit.  A MetLife employee wrote that MetLife "needs to provide specifics" and "cannot deny the claim based solely on the statement from the employer."  The employee then requested another employee "explain this to [the Plan] and ask them for assistance in obtaining the specific information." Def.'s App. of Exs. 512.  Only after this confirmation did MetLife deny Malishka's claim.

After Malishka filed suit, MetLife withdrew its motion to dismiss for failure to exhaust administrative remedies and agreed to put the case in suspense.  This allowed Malishka an opportunity to appeal her decision with MetLife, even though the deadline for such an appeal had long passed.  In order to further facilitate this process, MetLife allowed Malishka to submit any additional documentation she believed relevant to the record. [2]  MetLife also requested that the

---

[2] Malishka asserts that the quarterly work summary is insufficient because it fails to distinguish between regular and overtime hours, which she claims are awarded different credit.  She also claims that the Decedent was disabled in the quarter he lost eligibility, which would have activated Plan provisions extending his coverage.  Because no evidence exists supporting either claim in the administrative record, they are denied.  *See* Def.'s App. of Exs. 585

Union provide a synopsis of the Decedent's quarterly work history to independently confirm the Decedent's eligibility through his hours worked.  Both Copperwheat and another MetLife employee each reviewed the administrative record before MetLife upheld its adverse determination.[3]  *Id*. at 594-95.

Viewed against this backdrop, Copperwheat's unanswered position does not demonstrate that "whenever it was at a crossroads, [MetLife] chose the decision disfavorable to [Malishka]." *Pinto*, 214 F.3d at 394.  On the contrary, MetLife appears to have complied with, and at least once gone beyond, the procedural requirements of the Plan.  MetLife's conflicts of interest do not suggest an abuse of discretion.

## IV. Conclusion

Even viewing as a whole the ambiguous plan language, inherent financial conflict of interest, and Copperwheat's recommendation that Malishka be entitled to benefits, MetLife did not abuse its discretion.  For the reasons above, I will grant MetLife's motion for summary judgment.  I will deny Malishka's motion for summary judgment.


                                                          s/Anita B. Brody

                                                          _____
                                                          ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:            Copies **MAILED** on _____ to:

---

(confirming Decedent was not on disability credit).
[3]  Malishka argues that MetLife did not "exercise" its discretion and instead deferred to the Plan's findings and interpretations, making de novo review appropriate.  The administrative record suggests otherwise.  Even if this were true however, arbitrary and capricious review would still be appropriate because the Plan Document grants discretion to both the Plan *and* MetLife to find facts and interpret the Plan's provisions.

O:\ABB 2014\L - Z\Malishka v. Metlife SJ memo.docx